## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JJ WATER WORKS, INC.,**

      Plaintiff,

      v.

**SAN JUAN TOWING AND MARINE
SERVICES, INC.,**

      Defendant.

Civil No. 13-01293 (BJM)

## OPINION AND ORDER

     JJ Water Works, Inc. ("JJ") sued San Juan Towing and Marine Services, Inc. ("SJT")
in admiralty. Docket No. 1 ("Compl."). JJ claims that it leased a barge to SJT and that SJT
is liable for charter hire owed, for the cost of repairs to the barge, and for the cost to JJ of the
period during which the barge was out of operation while awaiting repairs. *Id.* SJT denied
all liability and made three counterclaims, alleging that JJ (1) breached the charter
agreement; (2) breached the implied warranty of seaworthiness; and (3) tortuously interfered
with another SJT contract under 31 L.R.P.A. § 5141. Docket No. 10 ("Answer,"
"Countercl." starting at 8). JJ moved for summary judgment on SJT's counterclaims, SJT
opposed, JJ replied, and SJT surreplied. Docket Nos. 26, 27 ("Pl.'s Mem."), 37 ("Def.'s
Mem."), 44 ("Reply"), 50 ("Sur."). For the following reasons, JJ's motion is **granted in
part** and **denied in part**.

## SUMMARY JUDGMENT STANDARD

     Summary judgment is appropriate when "the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). A fact is material only if it "might affect the outcome of the suit under
the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and "[a]
'genuine' issue is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S.
Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). The court does not weigh the facts, but

instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1). If this threshold is met, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not prevail with mere "conclusory allegations, improbable inferences, and unsupported speculation" for any element of the claim. *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Still, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," *Leary*, 58 F.3d at 751, and the court must not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).

## BACKGROUND

This summary of the facts is guided by the parties' Local Rule 56 statements of uncontested facts. *See* Docket Nos. 27 ("SUMF"), 36 ("OSMF," "SAMF" starting at 5), 45 ("RSMF" starting at 2).[1]

JJ is a Puerto Rico corporation, owned in equal shares by Juan M. Labrador, its president, and José Caballero, its secretary. SUMF ¶¶ 1; SAMF ¶¶ 80, 81, 83. Its principal

---

[1] Local Rule 56 requires parties at summary judgment to supply brief, numbered statements of facts, supported by citations to admissible evidence. It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and prevents litigants from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007). The rule "permits the district court to treat the moving party's statement of facts as uncontested" when not properly opposed, and litigants ignore it "at their peril." *Id.*

place of business is Ceiba, Puerto Rico.  SUMF ¶ 1.  SJT is also a Puerto Rico corporation, with its principal place of business in the Port of San Juan, Puerto Rico.  SUMF ¶ 3.  Mark Payne is SJT's vice president.  SUMF ¶ 14.

### The Charter

SJT contracted with Dragados USA, Inc. ("Dragados"), to provide dredging services on the Puerto Nuevo River, and so chartered from JJ a barge, the Caribe Lifter, which came equipped with a crane.  SUMF ¶¶ 3, 5–7, 11, 12; SAMF ¶ 104; *see* Docket No. 27-2 ("Charter").  The crane was, in fact, an essential component of the chartered vessel; the parties considered it to be "part of the barge."  SAMF ¶ 104.  JJ itself had no contractual relationship with Dragados.  SAMF ¶ 89.  The parties were familiar with each other: SJT had rented the Caribe Lifter and its crane from JJ in the summer of 2012 for a job off the coast of Mona Island (the "Mona Project"), which ended less than a month before the charter at issue here.  SUMF ¶¶ 8–9.

That charter was memorialized in a purchase order[2] executed on November 21, 2012, after Labrador had reviewed its terms without objection.  SUMF ¶¶ 4, 7; SAMF ¶¶ 85–86.  Payne was the drafter, though not every term came from SJT; with some exceptions, the record is unclear as to which party proposed which provisions.  SUMF ¶ 14; SAMF ¶ 87.  JJ agreed to lease the Caribe Lifter at a daily rate of $2,500 from November 22, when it would be delivered in San Juan, through January 15, 2013, at which point the parties could agree in writing to extend the charter.  SUMF ¶¶ 6; Charter ¶¶ 1–4.  The daily rate included the services of Victor Mujica, a JJ employee, as barge superintendent, or "deck boss."  Charter ¶ 5; SAMF ¶¶ 1–14.

Under the charter, SJT was to conduct an "on hire survey" of the barge within five

---

[2] The purchase order purports to be for the "bareboat charter" of the Caribe Lifter.  Charter 1. I do not here so designate the charter, because whether the agreement was a bareboat charter (as opposed to a "time charter") is a mixed question of fact and law, one for which the pleadings, Local Rule 56 statements, and the document itself provide inconsistent answers.  I will address the issue in this opinion's discussion section.

work days of its arrival in San Juan, as well as an inspection of the crane and its machinery. SUMF ¶¶ 10, 11; Charter ¶¶ 7–8.  As to the crane inspection, SJT would "point out in writing any discrepancies" within five days of delivery.  SUMF ¶ 11; Charter ¶ 8.  SJT was obligated to return the barge and crane in as good condition as when delivered, "fair wear and tear not affecting normal operation excepted."  SUMF ¶ 12, 15; Charter ¶ 10.  The charter did not, by its terms, explicitly allocate liability for major repairs, whether to the barge itself or to the crane.  SUMF ¶ 13.

### Condition and Performance of the Barge[3]

Some welding was performed on the barge prior to the charter.  SAMF ¶ 38; RSMF ¶ 38.  SJT states that this work was done specifically because of the charter; JJ disagrees, disclaiming any causal connection.  SAMF ¶ 38; RSMF ¶ 38.  Two days after delivery, an independent company conducted an on hire survey of the barge and prepared a written report.  SUMF ¶ 16.

The parties disagree on whether welding or other maintenance was performed during the term of the charter.  SJT claims that before the barge could navigate up the Puerto Nuevo, welding was required inside the barge for reinforcement.  SAMF ¶¶ 47, 50, 53, 56–57. Mujica performed the welding with the assistance of Melquis Muñoz, an employee of SJT. SAMF ¶¶ 45, 47–50.  Mujica is not a certified welder; Muñoz is.  SAMF ¶¶ 39, 45; RSMF ¶ 39.  According to Muñoz, the interior of the barge was in poor condition at the start of the charter, and without the reinforcement work the barge would not, in his opinion, have been able to hold the weight of the crane.  SAMF ¶¶ 51, 57. But JJ states that all this welding, and the observations of Muñoz, actually occurred during the Mona Project, before JJ ever chartered the barge to SJT for use in dredging the Puerto Nuevo.  RSMF ¶¶ 47–57.

The parties do agree that, during the post-charter period in issue, pad eyes were installed on the barge, and the barge's winches were reinforced.  SAMF ¶¶ 33–34. JJ states

---

[3] Although the parties considered the crane to be part of the barge, SAMF ¶ 104, for clarity I address the barge and crane separately.

that both procedures were improvements, rather than repairs.  RSMF ¶¶ 33–34.

### Condition and Performance of the Crane

Two days after delivery, after the barge was set up and ready for use, Payne and a crane operator conducted a walkthrough inspection of the crane.  SUMF ¶ 17.  They did not make a report because, according to Payne, the inspection turned up "nothing significant." *Id.*  By this time, the barge was fully set up, and SJT was able to begin using it for the Puerto Nuevo dredging operation.  SUMF ¶ 18.

The operation did not run smoothly; nor did the crane.  Muñoz testified that he observed the crane to be in poor operating condition when he first started working on it, OSMF ¶ 58, though it is unclear when exactly that was.[4]  In any case, from close to the start of the charter in November on through January, the crane repeatedly manifested mechanical problems that prevented its use and required repairs.  SAMF ¶¶  15–29, 59–61, 63–71, 74–75, 103, 105, 107; *see* Countercl. ¶¶ 14–21.  SJT paid for all the necessary repairs.  SAMF ¶ 32.  When the crane was broken down or undergoing repairs, SJT could not use it, as intended, for dredging, and the several delays proved a source of friction between SJT and Dragados, the general contractor for the dredging project.  SAMF ¶ 124.

The parties dispute, in minor part, the extent of work done on the crane immediately prior to the charter, after the Mona Project was complete, and there are no records to settle the issue.  SAMF ¶ 40.  All agree that Mujica performed routine maintenance on the crane, consisting of checking the cables, oil, and greasing.  SAMF ¶ 43; RSMF ¶ 43.  JJ claims that Mujica also took unspecified additional steps to put the crane in working order.  RSMF ¶ 43.

### Role of Mujica

The charter terms providing for Mujica's position as barge superintendent were proposed by JJ.  SAMF ¶ 88.  During the charter period, while serving as deck boss aboard

---

[4] JJ purports to deny SJT's statement regarding Muñoz's observation of the crane by pointing to the uneventful crane inspection performed by Payne.  RSMF ¶ 58.  The fact of the inspection is uncontested.  However, JJ's reference to it does nothing to actually controvert the fact or the content of Muñoz's personal observation.

the barge, Mujica remained an employee of JJ and considered Labrador and Caballero his bosses.  SAMF ¶¶ 9, 11, 13.  JJ paid Mujica for his services aboard the barge, though this fact is qualified by JJ's statement that SJT was responsible for paying Mujica's overtime wages, and that Mujica was not required to inform JJ about his overtime work.  SAMF ¶¶ 14, 90; RSMF ¶ 14.

As deck boss, Mujica was in charge of the maintenance of the barge and crane, and he coordinated all repair work.  SAMF ¶¶ 30, 78.  JJ qualifies Mujica's role in coordinating repairs by stating that Payne, not Mujica, was responsible for deciding in the first instance whether to repair any damaged crane parts.  RSMF ¶ 78.  Mujica kept JJ informed of all repairs to the crane,[5]  SAMF ¶¶ 30–31,  and generally continued, during the charter period, to report to JJ's owners.[6]  SAMF ¶ 12.  He spoke with Caballero several times per week.  SAMF ¶ 122.  During that period, nobody from SJT, including Payne, told Mujica how to do his job or gave him an order.  SAMF ¶¶ 35–36.  JJ qualifies this fact by asserting that, while SJT did not exercise any control over Mujica's performance, it could have done so.  RSMF ¶¶ 35–36

### Amended Charter

On January 14, 2013, one day before the charter term expired, Labrador and Caballero, representing JJ, met with Payne, representing SJT, at SJT's office.  SUMF ¶¶ 19–21.  SJT was at least partially delinquent as to charter hire, and JJ wanted either to receive payment or to take back the barge and crane.  SUMF ¶¶ 19, 21.  At the meeting, the parties executed an amendment to the charter; Payne added several handwritten clauses to the bottom of the original purchase order.  SUMF ¶ 22; SAMF ¶ 98. *see* Docket No. 34-2

---

[5] JJ purports to deny this fact, stating that Mujica merely provided "commentary" about crane repairs to Labrador and Caballero.  RSMF ¶ 30.  This qualification does not effectively controvert SJT's statement that Mujica "would keep JJ informed of the repair work conducted on the crane."  SAMF ¶ 30.

[6] JJ purports  to deny this fact but again fails.  JJ states that Mujica also reported to Payne, RSMF ¶ 12; this fact, however, does not in itself controvert SJT's statement that Mujica reported to JJ.  Moreover, to the extent that JJ's attempted denial adds additional facts to the record on summary judgment, those facts should have been presented in a separate statement, rather than inserted within the response to SJT's statement, and are therefore disregarded.  *See Gomez-Gonzalez v. Rural Opportunities, Inc.*, 658 F. Supp. 2d 325, 335 n.16 (D.P.R. 2009).

("Amended Charter"), at 3.  The charter term was extended until February 15, but only provided that SJT paid the outstanding balance by January 18.  SUMF ¶ 23.  SJT also agreed to arrange a payment bond for the balance and to pay a two percent monthly late fee on open invoices.  SUMF ¶¶ 24–25.  These conditions were all proposed by JJ.  SAMF ¶¶ 93–95, 98; RSMF ¶ 96.  Additionally, SJT agreed to pay an extra $100 per month for Mujica's transportation expenses, previously covered by JJ.  SUMF ¶ 25; SAMF ¶ 97.  Labrador also added a handwritten notation, providing that JJ would not charge SJT for the 16-day period of the crane's initial breakdown.  SAMF ¶ 102.

### Lack of Payment; Communications with Dragados

On January 18, the deadline set by the amended charter for SJT to settle its outstanding charter hire, Payne emailed Angel Mendoza, the project manager for Dragados, explaining that the barge would have to be returned if SJT did not pay JJ.  SUMF ¶ 26.  Mendoza replied that SJT would likely receive payment from Dragados by the end of the following week.  SUMT ¶ 27.

The parties have not made clear what happened next.  Apparently, SJT did not pay JJ on January 18.  On January 25, Payne told Mendoza through email that JJ had expressed its intent to take back the crane for lack of payment.  SUMF ¶ 29.  The next day, Labrador emailed Payne to inform him that JJ would be "stopping the works due to breach of contract" on January 28 at 6:00 p.m. unless payment was received.  SUMF ¶ 30; Docket No. 34-5, at 2.  By the morning of January 28, JJ had not been paid,  and at 10:44 a.m., Payne forwarded Labrador's email to Dragados supervisors asking for direction on how to proceed.  SUMF ¶¶ 31–32.

At some point in the early afternoon, before Payne received a response, Labrador contacted Dragados directly.  SUMF ¶ 33; OSMF ¶¶ 32–33; SAMF ¶ 114.  Labrador spoke with Vincente Esquivel, who was in charge of the project, and explained that JJ was not being paid and would cease operations at 6:00; Esquivel told Labrador that operations would in fact cease at 2:00.  SUMF ¶ 33.  At 1:57, Esquivel responded to Payne's email instructing

him to proceed with demobilizing the barge and crane, starting at 2:00.   SUMF ¶ 32. Presumably, the Caribe Lifter was then returned to JJ.   But the parties' Local Rule 56 statements do not explore the aftermath of Esquivel's email, with one exception:  at some point in February, Labrador and Caballero met with Esquivel and another Dragados officer to discuss the situation between JJ and SJT.  SAMF ¶ 114.

## DISCUSSION

JJ contends that there are no genuine issues of material fact as to SJT's counterclaims for (1) breach of contract, (2) breach of implied warranty of seaworthiness, and (3) tortious interference with contract, and that the uncontested facts entitle it to judgment as a matter of law.

I pause briefly to address JJ's argument, raised in its reply, that SJT's opposition is "really a disguised and untimely Motion for Summary Judgment," Reply ¶ 9, because SJT "is basically requesting that the Court enter[] findings that would in turn dispose of" JJ's own claims.   *Id.* ¶ 8.   JJ apparently overlooks the function of summary judgment proceedings, despite setting them in motion itself.  Any finding here in SJT's favor would merely allow SJT's counterclaims to live another day.  It makes no difference, at this stage, that the merits of the parties' claims are likely inversely correlated.

Most likely, JJ is responding to the manner of SJT's argument.  SJT does, in fact, largely focus on the merits of its counterclaims, rather than identifying genuine issues of material fact.  To the extent that SJT's opposition reads more like a motion *for* summary judgment, I do not treat it as one, and JJ need not worry that in this order I will settle the whole case at once.

I now proceed to the three counterclaims at issue.

## I.      Breach of Contract

The elements of a breach of contract claim are (1) a valid contract and (2) a breach by a party to the contract.  *See, e.g.*, 17A Am. Jur. 2d Contracts § 707 (2014); 23 Williston on

Contracts § 63:8 (4th ed. 2014).[7]  A breach is the failure to perform a duty promised under the contract.  *See* Restatement (Second) of Contracts § 235 (1981); Williston, *supra*, § 63:1.

No one would fault SJT for making its first theory of recovery overly clear.[8]  The affirmative crux of the counterclaim seems to be the argument that, under the charter, SJT was responsible only for "ordinary daily" repairs of the barge and crane, while the charter imposed on JJ the duty to finance "major repairs and overhauls."  SJT alone paid for the crane's many repairs, most of which, at least, were "major," and it contends that JJ breached the charter by failing to pay for them itself as contractually required.  JJ argues in response that the burden of making repairs, major or minor, fell on SJT.  The question is how the charter should be interpreted.

I note at the outset that I understand SJT to argue here that JJ failed to perform a duty *other than that imposed by the implied warranty of seaworthiness*.  Of course, SJT argues separately that JJ breached that warranty; I discuss that claim below. But in its breach of contract counterclaim, SJT apparently contends that the charter placed on JJ the absolute responsibility to handle major repairs, whether or not the repairs were required because the Caribe Lifter did not perform as warranted.  My inquiry, in addressing the breach of contract claim, is thus limited to whether the charter in fact so allocates liability for repairs, and my conclusion on that score does not affect the viability of SJT's breach of warranty claim.  That is, even if the charter does not require JJ to pay for major repairs no matter what, SJT may be able to recover damages if it can show that JJ breached the warranty.

---

[7] Because admiralty actions are governed by federal substantive law, *S.S. Philippine Jose Abad Santos v. Bannister*, 335 F.2d 595, 597 (5th Cir. 1964), I cite to general principles of contract law, rather than to the law of any particular state.

[8] Under a "breach of contract" heading, SJT throws out, in conclusory fashion, a number of contract law buzzwords: it asserts that the "charter agreement was unconscionable for lack of consideration" and that its "consent to the charter agreement was defective," rendering the agreement "null and void."  Unconscionability, want of consideration, and absence of mutual assent are defenses to claims based in contract; they are not affirmative grounds for relief that may be asserted as counterclaims, and I do not address them here.  SJT argues that its consent was ineffective because it would not have entered into the charter had it known, as JJ did, that the crane was incapable of performing as desired.  To the extent that any part of this contention might constitute a valid independent claim, it is effectively subsumed by the claim for breach of warranty.

A charter, also called a "charter party," is a specialized maritime contract for the lease, by a "shipowner" to a "charterer," of an entire vessel. *See Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 823 (2d Cir. 2006) (citing *The New York*, 93 F. 495, 497 (E.D.N.Y. 1899)); *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 892 n.1 (5th Cir. 2005); 2 Thomas J. Schoenbaum, Admiralty and Maritime Law §§ 11-1, 11-2 (5th ed. 2013). Its formation and construction are governed by federal maritime law. *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 124 (2d Cir. 1982); Schoenbaum, *supra*, §§ 11-1, 11-2.

For the most part, traditional principles of commercial contract interpretation apply. *Marine Overseas Servs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1234 (5th Cir. 1986). So, for example, "[w]hen interpreting unambiguous provisions . . . a court may not look beyond the written language of the charter to determine the intent of the parties." *Wilson v. JOB, Inc.*, 958 F.2d 653, 657 (5th Cir. 1992). Ambiguous language typically is construed against its drafter. *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 554 F.2d 43, 47 (2d Cir. 1977) (quoting *Am. Exp. Isbrandtsen Lines, Inc. v. United States*, 390 F. Supp. 63, 66 (S.D.N.Y. 1975)). And individual provisions must not be read in isolation, divorced from context; the charter is interpreted "according to the intent of the parties as manifested by the whole instrument rather than by the literal meaning of any particular clause taken by itself." *The Rice Co. (Suisse) v. Precious Flowers Ltd.*, 523 F.3d 528, 534 (5th Cir. 2008) (quoting *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1368 (5th Cir. 1979)).

As a supplement to these traditional rules of construction, "where . . . the contract is one of charter party, established practices and customs of the shipping industry inform the court's analysis of what the parties agreed to." *Samsun Corp. v. Khozestan Mashine Kar Co.*, 926 F. Supp. 436, 439 (S.D.N.Y. 1996); *see also Great Circle Lines*, 681 F.2d at 125. Thus, while parties entering into a charter are free to allocate risks and responsibilities as they see fit, *see Cont'l Grain Co. v. P.R. Mar. Shipping Auth.*, 972 F.2d 426, 430 (1st Cir. 1992), convention may assign certain burdens not otherwise provided for. *See, e.g., Asphalt*

*Int'l, Inc. v. Enter. Shipping Corp.*, 514 F. Supp. 1111, 1116 (S.D.N.Y. 1981), *aff'd*, 667 F.2d 261 (2d Cir. 1981) ("Since the risk of the event was not allocated by the charter party, we next must consider whether custom in the trade allocates such a risk."). The court may also refer to the customary practices of the parties themselves to supply a missing term. *See, e.g.*, *Penn. R.R. v. McAllister Lighterage Line, Inc.*, 240 F.2d 423, 423 (2d Cir. 1957).

It is undisputed that the charter does not expressly allocate the cost of repairs required during the charter period. But it does provide that the barge and crane "shall be delivered to JJ in the same or as good structure, state, condition and class as when . . . delivered, fair wear and tear not affecting normal operation excepted." Charter ¶ 10. In JJ's view and mine, this redelivery clause settles the issue. The express and unqualified duty to return the barge and crane in comparable condition must mean that SJT bore the burden of carrying out any necessary repairs, beyond those directed toward normal wear and tear, or it means nothing at all.

Often, in cases where the court has found repair liability allocated by a charter's terms, the charter contains not only an equivalent redelivery clause, but also separate terms more specifically placing the duty to maintain and repair on the charterer. *See, e.g.*, *Sun Printing & Publ'g Ass'n v. Moore*, 183 U.S. 642, 655–56 (1902); *Dow Chem. Co. v. Texaco Ref. & Mktg., Inc.*, 877 F. Supp. 853, 856–58, 867–68 (E.D. Va. 1995). The absence here of additional language is not fatal to JJ's reading; indeed, more would be superfluous.

In the absence of any contrary provisions, the redelivery clause obligated SJT to take whatever steps necessary to return the barge and crane in the same condition as when delivered.[9] *See P. Sanford Ross, Inc. v. Moran Towing & Transp. Co.*, 55 F.2d 1052, 1053 (2d Cir. 1932) (charterer liable for repairs where oral charter made it "responsible for the

---

[9] I stress that my holding here does not foreclose the argument by SJT that the crane was in poor condition upon delivery. In relying on the redelivery clause, I hold only that the charter did not, as SJT contends, unconditionally place on JJ the burden of making "major repairs." As discussed below, SJT may still be able to show that JJ breached the implied warranty of seaworthiness, and that repairs were necessary not merely to maintain the vessel in like condition, but to place it in working order. The costs of repairs could then potentially be recovered as damages for breach of warranty.

scow and return in same condition as when taken," and it "failed to deliver in like condition"); *Atlas S. Corp. v. Hous. Marine Servs., Inc.*, Civ. A. No. 92-3350, 1993 WL 192870, at *1 (E.D. La. June 2, 1993) (where charter contained redelivery clause, charterer was not entitled to reimbursement for costs of repairs unless it could separately prove that the damage necessitating repair was caused by unseaworthiness); *Metro. Sand & Gravel Corp. v. The Dwyer No. 25*, 130 F. Supp. 172, 175 (S.D.N.Y. 1954) ("The charter provided that the Dwyer No. 25 would be returned to owner in same good condition, and the charterer is liable for breach of contract."); *The St. Nicholas*, 67 F. Supp. 380, 380–81 (E.D.N.Y. 1946) (where charter contained a redelivery clause and there was no "independent binding contract" obligating owner to provide repairs, charterer was not entitled to reimbursement for cost of repairs); *N.V. Zuid Hollansche Sheepvaarts Maatschappij v. Munson S.S. Line*, 32 F.3d 536, 536 (E.D.N.Y. 1929) (where charter provides "hire to continue until the hour and the day of her redelivery in like good order and condition, ordinary wear and tear excepted," charterer "is therefore liable for damages in excess of ordinary wear and tear.").

This interpretation is buttressed by my understanding of "the intent of the parties as manifested by the whole instrument rather than by the literal meaning of any particular clause taken by itself." *The Rice Co.*, 523 F.3d at 534. SJT's obligation to inspect the barge and crane upon delivery is consistent with placing solely on SJT the responsibility to repair. Were JJ to bear that responsibility, the duty to record the on-delivery condition of the barge and crane would more properly lie with JJ. Also consistent with my reading of the redelivery clause is the separate provision for a reduced daily rate in the event that "the barge is off hire for mechanical or weather deficiencies," Charter ¶ 4, which suggests that JJ's only duty in the event of a breakdown is to accept a reduction in pay. SJT repeatedly asserts that it "was not possible to conduct major repairs to the crane and to pay rental at the same time," Countercl. ¶ 22; Def.'s Mem. 9; Sur. ¶ 13, but the charter provides for this precise problem by lowering the rent for periods in which repairs are required.

SJT does not in its papers meaningfully address the charter's redelivery clause. It does so only obliquely, arguing that it should not be considered the drafter for interpretive purposes. Although SJT acknowledges that Payne, its vice president, typed up the document, it insists that it did not propose every term; with one exception, however, it does not identify which party was responsible for which of the original charter's provisions. I agree that SJT cannot be considered the drafter, so as to have ambiguities resolved against it, *see Navieros*, 554 F.2d at 47, at least at this stage of litigation, where SJT, as the nonmoving party, is entitled to every favorable inference. *See Leary*, 58 F.3d at 751. Regardless, a contract, maritime or otherwise, should be construed against the drafter only where it "is subject to opposing, yet reasonable interpretation." *Zapata Marine Serv. v. O/Y Finnlines, Ltd.*, 571 F.2d 208, 209 (5th Cir. 1978). I reach the conclusion that the redelivery clause defeats SJT's counterclaim not because I construe it against SJT, but because it is unambiguous. When a contractual provision is unambiguous, I need not, and must not, look elsewhere. *See Wilson*, 958 F.2d at 657.

But both parties would have me look beyond the charter's plain terms: their briefs focus in large part on how the charter should properly be classified. SJT argues that it is a "time charter," while JJ argues that it is a "bareboat charter."[10] And repair liability, each

---

[10] SJT insists that it "is already a matter of record that the charter agreement at issue in the instant case is a time charter." Def.'s Mem. 8. It is true that JJ has repeatedly referred to it as a time charter, including in its Local Rule 56 statement of uncontested material facts. *See* Compl. ¶ 4; SUMF ¶ 2. When arguing issues that arguably turn on the charter's character, however, JJ has asserted that the charter is bareboat. *See* Pl.'s Mem. ¶¶ 21–25. And the charter itself, submitted as an exhibit in support of JJ's Local Rule 56 statement, explicitly purports to be bareboat. Charter ¶ 1. While the court is under no duty to consider facts beyond those properly presented in the parties' Local Rule 56 statements, it may, and does so here. *See United States v. Diaz-Villafane*, 874 F.2d 43, 46 (1st Cir. 1989) ("[A] district court should be accorded considerable latitude in applying local procedural rules of its own making, and in departing from them."). I decline, moreover, to treat the paragraph in JJ's complaint stating that the contract was a time charter as a judicial admission that JJ cannot now contravene. What type of charter the parties entered into is at least partially a question of law; one cannot make a charter bareboat, for example, simply by saying it is. The court is not obligated to treat legal conclusions as binding judicial admissions. *See Taboas v. Fiddler, Gonzalez & Rodriguez, PSC*, 297 F.R.D. 16, 18 (D.P.R. 2014) (citing *Harrington v. Nashua*, 610 F.3d 24, 31 (1st Cir. 2010)). Finally, my decision to consider the question of the charter's character open is

contends, is determined by what type of charter it is.  In essence, the parties appeal to trade custom to allocate the disputed liability.  Because I find the redelivery clause conclusive, I address these arguments only for the sake of completeness, and because they are potentially relevant to SJT's breach of warranty claim.

There are three basic types of charter, only two of which are relevant here: the time charter and the bareboat (or "demise") charter.  *See* Schoenbaum, *supra*, § 11-1; *Limon v. Berryco Barge Lines, LLC.*, No. G–07–0274, 2011 WL 835832, at *4 (S.D. Tex. Mar. 7, 2011).  The principal "distinction between the demise and non-demise charters depends on the degree of control retained by the owner of the vessel."  *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993).  Under a time charter, "the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs."  *Nissho-Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 914 (2d Cir. 1980).  The owner remains in possession and control of the chartered vessel, provides a crew, and is responsible for "normal operating expenses."  *Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993).  "Further, in a time charter the owner fully equips and maintains the vessel [and] makes repairs as needed."  *Id.*

Under a bareboat charter, on the other hand, the owner "transfers full possession and control to the charterer, who in turn furnishes the crew and maintenance for the vessel."  *Forrester*, 11 F.3d at 1215.  For the bareboat charter to be valid, and not instead a time charter, the owner must "completely and exclusively relinquish possession, command, and navigation thereof to the demisee. . . . It is therefore tantamount to, though just short of, an outright transfer of ownership."  *Guzman v. Pichirilo*, 369 U.S. 698, 699 (1962) (citations omitted) (internal quotation marks omitted).  Because the owner "no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of its ownership."  *Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973).  Rather, it

---

guided by Federal Rule of Civil Procedure 8(e), which directs that pleadings "be construed so as to do justice."

is the charterer, enjoying unfettered use of the chartered vessel, who "becomes subject to the duties and responsibilities of ownership." *Id.* (quoting *Leary v. United States*, 81 U.S. (14 Wall.) 607, 610 (1872).

Thus "for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner pro hac vice." *Reed v. S.S. Yaka*, 373 U.S. 410, 412 (1963) (citations omitted); *see also McAleer v. Smith*, 57 F.3d 109, 112–13 (1st Cir. 1995). As owner pro hac vice, the bareboat charterer is responsible for repairs. *See Leary*, 81 U.S. (14 Wall.) at 612 (finding that there was not a bareboat charter because the owner was responsible for keeping the vessel in good condition); *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 676 (2d Cir. 1971) ("If the owner is responsible for keeping the vessel in good condition . . . it is extremely unlikely that there has been a demise."); *Davidson v. Baldwin*, 79 F. 95, 100 (6th Cir. 1897) ("Whenever the charter is . . . deemed to be owner pro hac vice, no liability for supplies or repairs attaches to the actual owner of the vessel."); *The U.S. 219*, 21 F. Supp. 466, 469 (E.D. Pa. 1937) ("[The] demise charterer was owner pro hac vice of the barge and accordingly had the right and indeed the duty to cause such repairs to the barge to be made as were necessary.").

Whether a time or a bareboat charter was created "depends on all the circumstances of the case, including not only the terms of the contract, but also the conduct of the parties under the arrangement." *Avin Int'l Bunkers Supply, S.A. v. Wellrun Mgmt.*, 607 F. Supp. 738, 741 (S.D.N.Y. 1985). The central question is whether there was a complete transfer of ownership sufficient to create a bareboat charter; "anything short of such a complete transfer is a time . . . charter party or not a charter party at all." *Guzman*, 469 U.S. at 700. There is a presumption against complete demise, and an owner claiming a bareboat charter bears the burden of establishing facts in accord with his position. *See id.*; *Fitzgerald*, 451 F.2d at 676.

Here, as a starting point, the charter's first clause provides: "This [purchase order] is for the bareboat charter of the barge Caribe Lifter . . . ." Charter ¶ 1. But this does not decide the issue; the label of a charter cannot by itself determine the liabilities of the parties.

*See Avin*, 607 F. Supp. at 741.  The issue, rather, is whether JJ relinquished full "possession, command, and navigation" of the barge and crane to SJT.  *Guzman*, 369 U.S. at 699.

"Authority over the manning of a vessel is an important determinant whether it is the owner or charterer who exercises management and control." *Stephenson v. Star-Kist Caribe, Inc.*, 598 F.2d 676, 680 (1st Cir. 1979).  The presence of an owner's crew aboard the chartered vessel is "very strong presumptive evidence . . . which only very cogent circumstances will overthrow" that the owner did not relinquish full control.  *Id.* (quoting *Hansen v. E.I. DuPont DeNemours & Co.*, 33 F.2d 94, 96 (2d Cir. 1929)) (internal quotation marks omitted).  However, such "cogent circumstances" may be provided by facts indicating that crew members, or even a captain, under the owner's employ are nevertheless functionally under the charterer's control.  *See Guzman*, 369 U.S. at 701 ("[T]he fact that the Captain is employed by the owner is not fatal to the creation of a demise charter party, for a vessel can be demised complete with captain if he is subject to the orders of the demisee during the period of the demise."); *Monk v. Cornell Steamboat Co.*, 198 F. 472, 475 (2d Cir. 1912); *Dalzell v. The St. Nicholas*, 109 F. Supp. 595, 599 (S.D.N.Y. 1951).

Here, on the present record, and affording SJT every favorable inference, I cannot say that the charter was bareboat as a matter of law.  There is no evidence that JJ was in control in any way over navigation of the barge;  nor, certainly, did JJ provide a full crew.  But it did provide Mujica, its own employee, to serve as barge superintendent.  The charter also obligated SJT to certify Mujica as a crane operator, Charter ¶ 6, though there is no evidence as to whether SJT met this obligation or whether Mujica in fact did that job.

 The precise extent of control retained by JJ over Mujica, and thus over the operation of the barge and crane, is disputed and uncertain.  Mujica coordinated repairs aboard the barge.  JJ maintains that he coordinated only those repairs decided on by SJT, but it is uncontested that nobody at SJT ever gave Mujica an order or otherwise told him how to do his job.  Mujica at least kept JJ apprised of the repairs he was coordinating, but it is unclear how much, if at all, JJ provided him with direction.  It can reasonably be inferred from the

undisputed facts that JJ exercised some control over Mujica, who exercised some control over the barge and crane. JJ has failed to demonstrate an absence of evidence supporting the conclusion that it retained control, and thus there is a genuine issue of material fact as to whether the charter was bareboat.

Were there nothing in the charter allocating the duty to repair, summary judgment would thus be inappropriate. Parties may contractually modify their traditional maritime rights and liabilities, however, and here the redelivery clause allocates that duty to SJT. JJ's motion for summary judgment is therefore granted as to SJT's breach of contract counterclaim.

## II.      Breach of Implied Warranty of Seaworthiness

SJT claims that by supplying a vessel in poor condition, JJ breached the implied warranty of seaworthiness. JJ argues that summary judgment is appropriate because SJT has failed to produce facts showing that the Caribe Lifter was unseaworthy upon delivery and, further, because SJT was aware of the crane's condition from its inspection and from its use of the same equipment for the Mona Project.

Every charter contains an implied warranty of seaworthiness. Schoenbaum, *supra*, § 11-8 (citing *Morales v. Galveston*, 370 U.S. 165 (1962); *Cont'l Grain Co.*, 755 F. Supp. 506); *see also The Caledonia*, 157 U.S. 124, 130 (1985); *Dempsey v. Downing*, 11 F.2d 15, 17 (4th Cir. 1926)). Under the warranty, the shipowner is obligated to "furnish a vessel and appurtenances reasonably fit for their intended use." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). More specifically, "all things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963). The warranty is absolute; the shipowner's liability does not depend on a finding of negligence or a lack of due diligence. *Mitchell*, 362 U.S. at 549; *The Caledonia*, 157 U.S. at 131.

Under a time charter, the warranty generally extends through the entire charter term. *See Williams v. Central Gulf Lines*, 874 F.2d 1058, 1062 (5th Cir. 1989) (quoting *P&E Boat Rentals, Inc. v. Ennia Gen. Ins. Co.*, 872 F.2d 642, 647 (5th Cir. 1989)) (internal quotation marks omitted) ("[A] time charterer . . . assumes no liability for . . . unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise."); *Wyche v. Oldendorff*, 284 F. Supp. 575, 577 (E.D. Va. 1967) ("The warranty of seaworthiness under a time charter rest [*sic*] solely with the owners."); Schoenbaum, *supra*, § 11-5.

If the charter is bareboat, on the other hand, the warranty "extends only to the beginning of the charter; subsequent to delivery the seaworthiness of the vessel is the responsibility of the charterer unless otherwise stated." Schoenbaum, *supra*, § 11-3 (citing *Reed*, 373 U.S. 410; *O'Boyle v. United States*, 47 F.2d 585 (2d Cir. 1931)); *see also McAleer*, 57 F.3d at 112 ("[A]n owner *pro hac vice* may be liable for the unseaworthiness of a vessel. In general, if there is an owner *pro hac vice*, the title owner will be absolved of personal liability." (citation omitted)); *Kerr-McGee*, 479 F.2d 61 ("[T]he owner of a vessel under a demise charter is liable only for unseaworthiness or negligence that pre-exists the charter."); *Ramos v. Beauregard, Inc.*, 423 F.2d 916, 918 (1st Cir. 1970) ("But the duty to provide a seaworthy vessel is grounded in personal obligation. We would reduce this notion of personal obligation to pure fiction if we extended it to include conditions arising during a demise charter, when the owner has no right to control and no opportunity to correct defects.").

Nevertheless, the owner may still be liable to a bareboat charterer for conditions manifesting during the charter if they are caused by a latent defect that rendered the vessel unseaworthy at delivery. *See McAleer*, 57 F.3d at 112 (explaining that a bareboat charter is liable for unseaworthiness during the charter "except for defective conditions that existed before the owner *pro hac vice* took control of the vessel"); *Rose v. Chaplin Marine Transp., Inc.*, 895 F. Supp. 856, 860 (S.D.W. Va. 1995) ("If the vessel was unseaworthy when delivered, the owner is liable for injuries caused by such unseaworthiness notwithstanding

the existence of the bareboat charter."); *Solet v. M/V Capt. H.V. Dufrene*, 303 F. Supp. 980, 985 (E.D. La. 1969) ("Since the unseaworthy condition in the present case existed prior to delivery of the vessel it is irrelevant whether the charter constituted a demise charter or was instead a time charter."). And "[i]f a defect without any apparent cause be developed, it is to be presumed it existed when the service began." *Work v. Leathers*, 97 U.S. 379, 380 (1878); *see also Metro. Coal Co. v. Howard*, 155 F.2d 780, 783 (2d Cir. 1946) ("[U]nfitness developing in a vessel shortly after she breaks ground, is proof enough of unseaworthiness.").

As discussed, I am unable to conclude at this stage that the charter was bareboat, thus relieving JJ of liability for unseaworthy conditions arising during the charter term. Regardless, it remains a genuine issue whether the crane was fit for its intended purpose at the time of delivery.[11] On the facts before me, the precise reason for the crane's repeated malfunctions is unclear. Although, as JJ points out, SJT was able to use the crane for a brief period before it broke down, it does not necessarily follow that the crane was in good condition at the start of the charter. SJT presented affirmative evidence, in the form of Muñoz's testimony, that the crane was in poor condition at some point near the start of the charter. JJ's response, that SJT's inspection of the crane revealed no significant defects, does not compel the conclusion that Muñoz was wrong. JJ stresses that its duty under the warranty is limited to providing a barge and equipment *reasonably* suited for their intended purpose, and insists it did so, despite the fact that the crane may have been in less than perfect condition. This is a fine distinction, one that, again, I cannot make based on the uncontested facts. Viewed in the light most favorable to SJT, the evidence readily supports a finding that the crane was not merely less than perfect, but less than seaworthy. Put another

---

[11] Since the warranty of seaworthiness extends to "all things about a ship," including "machinery" and "tools furnished," *Gutierrez*, 373 U.S. at 213, the Caribe Lifter as a whole would be rendered unseaworthy if its crane were not reasonably fit for its intended use. I do not separately analyze whether the barge itself was seaworthy because my findings as to the crane are enough to preclude summary judgment on this claim. I note also that my focus on the crane is appropriate given the parties' understanding that the crane was "part of the barge." *See* SAMF ¶ 104.

way, the facts are insufficient to rebut the presumption that the crane was in some way defective upon delivery.  *See Work*, 97 U.S. at 380; *Metro. Coal*, 155 F.2d at 783.

JJ also argues, essentially, that SJT waived the warranty of seaworthiness by inspecting the barge and crane and failing to object before leaving port.  There are indeed cases in which courts have found such a waiver.  *See Dant & Russell, Inc. v. Dillingam Tug & Barge Corp.*, 895 F.2d 507, 510 (9th Cir. 1989) ("Hvide, the demise charterer, supervised the inspection and took an active part in the repairs.  Hvide had full knowledge of the vessel's unseaworthiness and assumed all risks."); *Portsmouth Fisheries Co. v. John L. Roper Lumber Co.*, 269 F.586, 588 (4th Cir. 1920) ("The general rule is that the owner of a vessel is bound to the charterer to see that she is seaworthy . . . . But the rule does not apply when the charter undertakes by contract, either express or implied, to inspect the vessel and ascertain for himself her seaworthiness and fitness."); *Sanford & Brooks Co. v. Columbia Dredging Co.*, 177 F. 878, 883 (4th Cir. 1910) ("With full opportunity to examine, they must be presumed to have used their senses, and if by ordinary care . . . they omitted to use their senses, but closed their eyes, they cannot claim now to have relied upon an implied warranty.").

But the Fourth Circuit has clarified that a finding of waiver is appropriate only "where full inspection was made by those seeking to charter the vessels, with a view of and for the purpose of learning their condition, and the alleged defects or weaknesses were either patent or were especially called to such charterers' attention by the vessel owners." *Dempsey*, 11 F.2d at 17; *see also Thomas Jordan, Inc. v. Mayronne Drilling Mud, Chem. & Eng'g Serv.*, 214 F.2d 410, 412–13 (5th Cir. 1954) (approving of the *Dempsey* approach).  Here, the facts do not show that the crane's defects were readily discoverable by simple inspection, nor that JJ specifically alerted SJT to their presence.  Muñoz testified that he observed the crane to be in poor condition "from the first day he began working on it." OSMF ¶ 58.  The record does not divulge when Muñoz first began his work; it is possible that the defects were not patent at the time of delivery or inspection.  And, further, Muñoz's

observations were founded in "his experience with steel and as a certified welder." *Id.* Even in *Sanford & Brooks*, where waiver was found, the court stressed that the "defects in the gear were plainly discoverable. They were not such as required the exercise of special skill or care to detect them." 177 F. at 883. What matters is whether the unseaworthiness would have been revealed by an inspection undertaken with "ordinary care," *id.*, and the evidence, viewed in SJT's favor, does not show that the inspection here was deficient. There are therefore genuine issues as to whether any defects were patent within the meaning of *Dempsey* and whether SJT waived the implied warranty of seaworthiness by inspecting and accepting the barge and crane.

As for the fact that SJT had recently used the Caribe Lifter for the Mona Project, JJ has cited no authority, and I can find none, for the proposition that a repeat charterer forfeits its right to a seaworthy vessel upon the start of a new charter. JJ's contention is belied, in any case, by the maintenance performed on the crane prior to delivery. *See* SAMF ¶ 43; RSMF ¶ 43. SJT could not have known the crane's condition when that condition was altered between the two projects.

Because SJT's breach of warranty counterclaim is not foreclosed by the uncontested facts, JJ's motion for summary judgment on that claim is denied.

## III.   Tortious Interference with Contract

SJT alleges that JJ tortuously interfered with the contract between SJT and Dragados in violation of Puerto Rico law. The court has supplemental jurisdiction under 28 U.S.C. § 1367. The crux of the claim is that JJ gave SJT until 6:00 on January 28 to pay delinquent charter hire, but then caused Dragados to order that the barge and crane be shut down at 2:00, making it impossible for SJT to carry on its work for Dragados. SJT argues that if JJ had not contacted Dragados, SJT could have made good by the deadline and thus continued to perform for, and be paid by, Dragados.

This claim is brought under Puerto Rico's general tort statute, Article 1802 of the Civil Code, which provides: "A person who by an act or omission causes damage to another

through fault or negligence shall be obliged to repair the damage so done." 31 L.P.R.A. § 5141. Article 1802 encompasses tortious interference claims. *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.*, 115 P.R. Offic. Trans. 727, 734 (1984)). To prevail, a plaintiff must show: "(1) the existence of a contract between two or more parties, (2) interference with that contract by the defendant, (3) 'fault' on the defendant's part, (4) damage to the plaintiff, and (5) a nexus between the plaintiff's damages and the defendant's fault." *Id.* (citing *Gen. Office Prods.*, 115 P.R. Offic. Trans. at 734–35). The "fault" element requires that the defendant have "intended to interfere with the contract, knowing that this interference would cause injury to the plaintiff." *Id.* at 10 (citing *Jusino Figueroa v. Walgreens of San Patricio Inc.*, 155 P.R. Dec. 560 (2001)). In short, the defendant must have "acted tortiously." *Id.* (quoting *Gen. Office Prods.*, 115 P.R. Offic. Trans. at 734).

Despite a relatively weak showing by SJT, summary judgment in JJ's favor is inappropriate. JJ denies, first, that it interfered with the SJT-Dragados contract at all, arguing that its communication with Dragados played no relevant part in Dragados's decision to demobilize the barge at 2:00. But the uncontested facts at least permit the inference that the decision was influenced by Labrador's conversation with Esquivel, and at this stage I must draw inferences in SJT's favor. Such influence can be viewed as amounting to interference; it resulted in SJT's being unable to perform under, and thus breaching, its contract with Dragados.

JJ next argues, not unpersuasively, that the fault element of a tortious interference claim is not satisfied, because it was entitled to demand the barge's return once SJT breached the amended charter by failing to tender full payment by January 18. JJ had already informed SJT of its intent to take back the barge, as was its right, and SJT had already informed Dragados. Again, however, the facts permit an inference that JJ acted tortiously. JJ told SJT that it would be repossessing the barge and crane at 6:00, and SJT may have relied on that representation, waiting until then to either pay JJ or scrounge up the necessary

funds.  Despite the fact that SJT has presented no evidence that it would have been able to pay by 6:00, if JJ in fact caused Dragados to shut down SJT's operations four hours early, it effectively misled SJT, and that is fault enough.

It is troubling that SJT has failed to provide any evidence at all that it was injured by the early shutdown, as it would have to prove at trial.  While it alleges injury in its papers, *see* Countercl. ¶ 51, to survive summary judgment, the non-movant is required to demonstrate a genuine dispute through evidence "beyond the allegations of the complaint." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975) (citing *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972)).  But once more, it may be inferred that this element is satisfied.  It seems likely that the barge's removal prevented SJT from continuing its work, and that Dragados did not pay SJT for work that was never done.  If, but for Dragados's unexpected order, SJT would have been able to keep the barge and keep working, it suffered the required harm.

There are therefore genuine issues of fact as to (1) whether JJ interfered with the SJT-Dragados contract; (2) whether, if so, it was at fault;  and (3) whether SJT was harmed by any interference.  Because these real disputes remain, JJ's motion for summary judgment on this claim is denied.

## CONCLUSION

For the above reasons, JJ's motion for summary judgment is **GRANTED**, as to the breach of contract counterclaim, and **DENIED**, as to the breach of warranty and tortious interference counterclaims.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 23rd day of September, 2014.

*S/Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge